# THE CITY OF NORWICH.

## PLACE & Others *v.* NORWICH & NEW YORK TRANSPORTATION COMPANY.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF NEW YORK.

Argued November 16, 17, 1886.—Decided May 10, 1886.

In a case of collision occasioned by the negligence of the officers or hands of one of the vessels, without any neglect, privity, or knowledge of her owner, and where said vessel took fire and sank with loss of cargo, and never completed her voyage nor earned any freight, but was afterwards raised and repaired, and was then libelled and seized on behalf of the owners of her cargo, and claimed and bonded at her then value by her owner, who filed an answer and a petition for limited liability; and where it further appeared that the owner received certain moneys for insurance of the ship against loss by fire, *Held*:

(1.) That the owner was entitled to a limitation of liability to the value of his interest in ship and freight under the act of 1851. Sections 4282–4287 Rev. Stat.

(2.) That the point of time at which the amount or value of the owner's interest in ship and freight is to be taken for fixing his liability is the termination of the voyage on which the loss or damage occurs.

(3.) That if the ship is lost at sea, or the voyage be otherwise broken up before arriving at her port of destination, the voyage is then terminated for the purpose of fixing the owner's liability.

(4.) That in the present case, the voyage was terminated when the ship had sunk, and that her value at that time was the limit of the owner's liability; and that the subsequent raising of the wreck and repair of the ship, giving her an increased value, had nothing to do with the liability of the owner.

(5.) That no freight except what is earned is to be estimated in fixing the amount of the owner's liability.

(6.) That insurance is no part of the owner's interest in the ship or freight within the meaning of the law, and does not enter into the amount for which the owner is held liable.

(7.) That the limitation of liability is applicable to proceedings *in rem* against the ship as well as to proceedings *in personam* against the owner; the limitation extends to the owner's property as well as to his person.

(8.) That the right to proceed for a limitation of liability, is not lost or waived by a surrender of the ship to underwriters.

In this case, although an application for limitation of liability had been origi-

nally overruled by the District Court, and an interlocutory decree had been rendered in favor of the libellants for their entire damage, with a reference for proofs and a report by the master; yet the court, after the decision of this court in *Norwich Co.* v. *Wright,* 13 Wall. 104, relating to the same collision, and the promulgation of the additional rules adopted by this court, received a new petition and ordered a new appraisement to ascertain the value of the ship whilst lying sunk; and made a decree limiting the liability of the owner to the value at that time: *Held* that the District Court had jurisdiction to receive such new petition and to take such proceedings.

The case was stated by the court as follows:

This case arose out of a collision which occurred on Long Island Sound, opposite Huntington, on the 18th of April, 1866, between the Steamboat City of Norwich, belonging to the Norwich and New York Transportation Company, the appellees, and the schooner General S. Van Vliet, belonging to William A. Wright and others, appellants, by which the schooner and her cargo were sunk and lost, and the steamboat was set on fire and sunk, and her cargo lost. The owners of the schooner filed a libel *in personam* in the District Court of the United States for the District of Connecticut, against the owners of the steamboat, and obtained a decree for about $20,000 for the schooner, and about $2000 for her cargo, with interest. Before the decree was passed, the respondents filed a petition, stating that proceedings *in rem* had been commenced against the steamboat in the District Court of the United States for the Eastern District of New York, for the recovery of damages for the loss of the cargo on board said steamboat; and they prayed leave to show the whole amount of damages sustained by all parties, and the value of the steamer and her freight then pending; and that the libellants might have a decree for only such proportion of damages sustained by them as the value of steamer and freight bore to the whole amount of damages sustained by all parties by the collision; this claim being made under the limited liability act of 1851. The District Court denied the prayer of this petition, holding that it had no jurisdiction to give relief. On appeal to the Circuit Court the decree was affirmed, and the petition for limitation of liability was denied on the ground that cases of collision were not within the act. The case then

came to this court, and we held, *first*, that the act of 1851 adopted the general maritime law in reference to limited liability as contra-distinguished from the English law, measuring the liability by the value of ship and freight after, instead of before, the collision; *secondly*, that the act embraced cases of damage received by collision as well as cases of injury to the cargo of the offending ship; *thirdly*, that the district courts of the United States, as courts of admiralty, have jurisdiction to administer the law; *fourthly*, that the proper court to hear and determine the question is the court which has possession of the fund, that is, the ship and freight, or the proceeds and value thereof. And in view of the want of rules of procedure, and of any uniform practice on the subject, we directed that proceedings should be suspended in the District Court of Connecticut, in order to give the respondents an opportunity of making the proper application to the District Court of the Eastern District of New York, which had possession of the steamer, or a stipulation for her value in lieu of the steamer itself. We also adopted some general rules of practice for the aid and guidance of the district courts in such cases. *Norwich Co.* v. *Wright*, 13 Wall. 104.

The libel *in rem*, filed in the District Court for the Eastern District of New York, was filed by George Place and Charles Place (now appellants here) in August, 1866, after the steamboat had been raised and carried to the shore of Long Island and repaired. The Norwich and New York Transportation Company appeared as claimants, and filed an answer and a petition to have the benefit of the act of 1851 for a limitation of their liability to the value of the steamboat and freight pending at the time of the collision and fire. Other libels were also filed by other owners of cargo. The steamer as repaired was appraised at $70,000.

On the 13th day of June, 1872, after the decision of this court was rendered in the case of the *Norwich Co.* v. *Wright*, the company, by leave of the court, filed a new petition in the District Court for the Eastern District of New York for the benefit of limited liability under the act of 1851, conformable to the rules adopted by this court.

The petition stated the various claims against the vessel arising out of the collision, (amounting to nearly $150,000,) the previous proceedings that had been taken, the libels that had been filed, the circumstances of the loss, the raising and repair of the vessel, &c., and prayed for a new appraisement in accordance with the decision of this court, a monition to claimants, &c., as will more fully appear in the finding of facts made by the Circuit Court, hereinafter stated.

Orders for publication and appraisement were made pursuant to the prayer of the petition, and the commissioner appointed to make the appraisement reported as follows, to wit. :

"In ascertaining the value of the steamboat City of Norwich, as directed by the order of reference herein, I have followed what I understood to have been the decision of the Supreme Court of the United States in the case of Wright against the owners of this boat, 13 Wall. 104, and have ascertained her value in the situation and condition she was in after the collision, and before she was raised, and I find from the testimony taken before me that she was at that time of the value of $2500. I have arrived at such value by taking the testimony as to her value in New York after she was raised by her owners and brought there, which shows that she was then and there worth the sum of $25,000, and I have deducted from that amount the sum of $22,500, being the sum which, according to the testimony, it had actually cost to raise her and bring her to New York, which leaves $2500 to be her value, as I have above stated."

Exceptions were taken to the report, first, that the former appraisement of $70,000 was binding on the parties and the court; secondly, that the appraisement should have been for the value of the steamer immediately before the collision; thirdly, that it should have been for the value immediately after the collision, before the occurrence of damage by the fire; fourthly, that there should have been no deduction for the expenses of raising the steamer; fifthly, that the sum of $600 should have been added for the pending freight; sixthly, that the money received for insurance on the vessel should have been added, amounting to $49,283.07.

The exceptions were overruled, and a decree was made authorizing the petitioners to pay into court the sum of $2500, the value of the steamer, and directing a monition to issue, citing all parties interested to appear and prove their claims, restraining the further prosecution of all suits, and appointing a commissioner to take proof of claims. On the subsequent report of the commissioner a final decree was made in January, 1879, distributing the fund in court, and discharging the petitioners from further demands.

The case was appealed to the Circuit Court and argued before Mr. Justice Strong, who, in October, 1879, affirmed the decree of the District Court, but the decree of affirmance was not entered until July 3, 1882. That decree is now before us for review. The finding of facts by the Circuit Court was substantially as follows:

1. It states the fact of the collision, and that "it was caused by the negligence of the steamboat's officers or hands, without any design, neglect, privity or knowledge of her owners. Very soon, within half an hour after the collision, the boat took fire, her deck and upper works were burned off, and she sank in about twenty fathoms of water. The fire was the direct consequence of the collision and inseparable from it. It was caused by the rushing of the waters through the broken hull of the boat, whereby the fire was driven out of the furnaces upon the woodwork, and the boat sank by reason of her filling with water.

"2. At the time of the disaster the boat had a cargo of merchandise on board belonging to different freighters, all of which was totally lost. The freight then pending amounted to $600, but none of it was earned or received by the ship owners.

"3. Sometime after the steamboat was sunk, and her cargo destroyed, she was raised by salvors and taken to the Long Island shore, within the port of New York, where she was repaired."

4. It states the suit by Wright & Co., in the District Court of the United States for the District of Connecticut, and the decision of the Supreme Court in that case.

5. It states the proceedings upon libel filed by George and

Charles Place in the District Court for the Eastern District of New York, the appraisement at $70,000, and the release of the vessel to the claimants (The Norwich & N. Y. Trans. Co.) upon their giving stipulation therefor, adding, "The stipulation purported to be for the security not only of the Messrs. Place, but also for the benefit of all persons who might, by due proceedings in said court, show themselves entitled to liens upon the vessel by reason of said collision. The appraisement was of the value of the vessel as it was after she had been raised and repaired. It was returned into the court on the 11th of March, 1867, and the stipulation in the amount of the appraisement was filed on the 29th day of the same month. On the 20th day of December, 1869, the District Court ordered decrees to be entered in favor of the libellants in all the suits commenced against the steamer as aforesaid.

" 6. Such was the condition of the litigation when the present petition was filed in July, 1872, after the rendition of the judgment by the Supreme Court in the case of the libel of William A. Wright *et al.* in the District Court of Connecticut. The petition prayed that, in conformity with the act of Congress, the decision of the Supreme Court, and the admiralty rules made in pursuance thereof, the court would cause an appraisement to be made of the value of the interest of the petitioners in the steamboat, and her freight for the voyage in which she was employed, for which they were liable, and that an order should be made for paying the amount of such valuation into court, or for giving a stipulation therefor, with sureties. It prayed further for a monition against all the persons claiming damages arising out of the said collision and fire, citing them to appear and make proof of their claims, and it prayed also for a restraining order against the further prosecution of all or any suits against the steamboat or the petitioners for any damage caused by the collision, fire, and loss. There was also a prayer for general relief. The monition was issued, the appellants appeared, and an order was made for an appraisement of the amount of value of the interest of the petitioners as owners, respectively, of said steamboat and her freight, pending for the voyage upon which she was employed, for which the petition-

ers were liable. A restraining order, as prayed for, was also made. Pursuant to the direction of the court, an appraisement was made. The appraiser ascertained and reported the value of the steamboat, as she lay immediately after the collision and fire, and before she was raised, to have been $2500, and the District Court confirmed the report and ordered the amount to be paid into the registry, which was accordingly done.

" 7. The value of the interest of the petitioners in the steamboat, as she was immediately after the disaster, was $2500 and no more.

" 8. The value of that interest immediately before the collision was $70,000.

" 9. When the collision occurred the steamboat was insured against fire (not against marine disaster), and upon the several policies the petitioners, as owners, have recovered from the underwriters the sum of $49,283.07; that part of said sum was recovered by the petitioner herein in an action brought by it in the Circuit Court of the United States for the District of Connecticut on one of said five policies against the Western Massachusetts Insurance Company. One of the defences in that action was that the loss and damages were occasioned by the collision (which is the same mentioned in these proceedings), while the petitioner herein claimed that the greater part of the loss was by fire. The court held in that case that there were two classes of losses : one, the damage done the steamer by the collision itself, and the other caused by the fire. The damages caused by the collision were proved at $15,000. The damages caused by the fire were determined to be $69,000. The said insurance company moved for a new trial, but the motion was denied.

" 10. The steamboat itself has never been surrendered or transferred to a trustee for the persons injured by her fault."

The conclusions at which Mr. Justice Strong arrived upon these facts were : 1st. That the value of the steamboat immediately after the collision and fire, as she lay at the bottom of the Sound, with her pending freight, was the measure of the owners' liability, and the amount to be apportioned. 2d. That insurance is not an *interest* in the vessel within the mean-

ing of the 3d section of the act of 1851, or section 4283 of the Revised Statutes.    3d. That the limitation of the owners' liability under the act is as applicable when the proceeding is *in rem*, as when it is *in personam*; so that, if the owners' lia- bility is only the amount of the vessel's value when at the bot- tom of the Sound, the vessel's liability, after being raised and repaired, is no greater.

*Mr. J. Langdon Ward,* for appellants Place and Bigelow.

I. Neither the District nor the Circuit Court had jurisdiction to entertain the petition in these proceedings, nor by order or decree thereon to perpetually restrain these appellants from proceeding to decree under the libels filed by them. *The Scotland,* 105 U. S. 24, 33; *The Ann Caroline,* 2 Wall. 538; *The Lottawanna,* 21 Wall. 558; *Norwich Co.* v. *Wright,* 13 Wall. 104; *Prov. & N. Y. Steamship Co.* v. *Hill Mfg. Co.,* 109 U. S. 578.

II. The order of March 5, 1873, directing an appraisement was unauthorized and irregular, and must, with the proceed- ings founded thereon, be set aside so far as these appellants are concerned.   The stipulation for value represented the ship, was her proceeds, and constituted the fund. which in any event the court was bound to apportion under the second petition. *Norwich Co.* v. *Wright,* above cited; *The North Carolina,* 15 Pet. 40.

III. The court below erred in finding as matter of fact that the fire was inseparable from the collision.

IV. It also erred in finding as matter of fact that the order for the appraisement of the amount of the value of the inter- est of the petitioners as owners respectively of said steamboat and her freight pending was made *after* the issue of the moni- tion and the appearance of these appellants herein.

V. It also erred in finding as matter of fact that the value of the interest of petitioners in the steamboat as she was im- mediately after the disaster was $2500 and no more.   *Sun Mut. Ins. Co.* v. *Ocean Ins. Co.,* 107 U. S. 485, 501.

VI. The sum received by the petitioners from the insurance companies as indemnity for the damage caused to the City of

Norwich by fire, with interest from the date of its receipt, should have been included in the appraisement of the amount of the value of the interest of the petitioners as owners in that vessel. This is discussed in *The Scotland, post* 507; and *The Great Western, post* 520; We adopt all that is there said by the able counsel, and, without repeating it further, present our own views of the statute, based upon its wording.

The act of 1851 provides that the liability of the owner or owners of the vessel for damage caused as in the present case "without the privity or knowledge of such owner or owners, shall in no case exceed the amount or value of the interest of such owner or owners respectively in such ship or vessel and her freight then pending;" and then provides that where loss has been suffered by several owners of property, exceeding the whole value of the ship or vessel, and her freight for the voyage, they shall receive compensation from the owner or owners in proportion to their respective losses, and that any one interested may take appropriate proceedings for the apportioning of the sum among the parties entitled thereto. It then provides that a transfer by the owner of his interest in the ship and freight to a trustee for the benefit of the claimants shall be deemed a sufficient compliance with the act. At what time is that interest to be estimated? This court has considered it three times: in *The Benefactor*, 103 U. S. 239, 246; *Norwich Co.* v. *Wright*, above cited; and *The Scotland*, 105 U. S. 24. Neither of these expositions is sufficiently comprehensive to meet all the cases which can arise. See *The North Star*, 106 U. S. 17. It seems to us that the meaning and intent of the legislature, in the enactment of this statute, was to constitute the owners of a vessel, on the instant of the happening of any event by reason of which damage might result to others, for which they were or might be liable, and for which they desired to limit their liability under the statute, into trustees, holding the vessel and everything which might be realized from her thereafter during that voyage for the benefit of the sufferers. It is a fundamental principle in the interpretation of statutes that they must, if possible, be so construed as to operate with uniformity in all cases; and on no

other theory can absolute uniformity be secured in the operation of this statute.

The liability of the vessel owner to the shipper of the cargo, for damage to his cargo during the carriage, results from the contract of carriage, and its breach; and the action for breach of that contract in a case where the damages would be properly limited under the statute, would be what was formerly denominated an action of trespass on the case. The responsibility of the vessel owner for damages caused by collision with another vessel, in a case where his responsibility for those damages would be limited by the statute, would arise from his responsibility for the act of his master or mariners, his servants, and would be an action of trespass on the case. Both these actions sound in tort. It is settled law that in such an action the right of action accrues at the instant of the commission of the fault, even though the resulting damages may not be suffered for some time afterwards. *Argall* v. *Bryant*, 1 Sandford (N. Y.), 98; *Wilcox* v. *Plummer*, 4 Pet. 172.

Such being the case, it is equitably and fairly within the meaning of the law, that at the instant of the occurrence by which the liability of the shipowner is fixed, the ship itself and the freight that may be earned on that voyage should be deemed appropriated to the satisfaction of the resulting damages, and so it was held under the statute 53 Geo. III. ch. 159, the wording of which was entirely similar to the act of 1851. *Dobree* v. *Schroder*, 6 Sim. 291; see also *Waldron* v. *Willard*, 17 N. Y. 466.

If we are correct in this it is manifest that the rules applied in the cases above cited cannot be applicable to all possible cases. It is no answer to this to say that the contract of insurance is a personal contract, and that no insurable interest remains in the holder after transfer of the property. For, in the first place, if as matter of fact the transfer to a trustee were made before the occurrence of subsequent disaster, there would be opportunity for, and it would be the duty of, the trustee to insure the property forthwith, and by delay on the part of the owners for their own benefit in taking such a course the sufferers should not be prejudiced; and second, in the case at

bar the moneys have been collected from the insurance companies and received by the owners, and we say that, under the statute, the common case is presented of the legal title to property vested in one person, the beneficial interest in another, and in analogous cases it has been uniformly held that if loss or damage occurs to the property, and the holders of the legal title receive compensation therefor, they receive it for the benefit of the holders of the beneficial interest. *Wyman* v. *Wyman*, 26 N. Y. 253 ; *Burbank* v. *Rockingham Ins. Co.*, 4 Foster (24 N. H.) 550 ; *Beach* v. *Bowery Ins. Co.* 8 Abb. Pr. (N. Y.) 261 ; *Parry* v. *Ashley*, 3 Sim. 97 ; *Ins. Co.* v. *Updegraff*, 21 Penn. St. 513 ; *Gates* v. *Smith*, 4 Edw. Ch. (N. Y.) 702 ; *Eagle's Case*, 3 Abb. Pr. (N. Y.) 218–235.

The act of 1851 does not release the shipowner from the obligation to secure trustworthy persons to manage his vessels. Recognizing that with the utmost diligence he may fail in doing so, and aiming to enable the honest shipowner to invest a part of his capital in ships on the sea without perilling what remains to him on land, it only requires him in case of disaster to surrender his interest in what remains. That interest includes insurance. See Abbott''s Law Dict. Tit. Interest. To hold otherwise would nullify the act of 1851, as it will permit the owner to retain his sea fortune intact, while refusing redress to the sufferers by the misconduct of his own agent.

We submit that the change of the phraseology in the Revised Statutes: to wit, § 4283, "the liability of the owner of the vessel . . . shall in no case exceed the amount or value of the interest of such owner in such vessel," indicates conclusively the intention of the legislature to be that for which we have contended, and excludes the interpretation placed upon the act of 1851 by the court below.

If it is objected that this theory of a trust finds no support in the wording of the act of 1851; we say that it necessarily results therefrom, though not declared *in ipsissimis verbis*.

By the maritime law the sufferers by the fault of a ship acquire, on the commission of the fault, a lien upon the offending *res* for their damages, that is a right in the thing.

In the case of cargo the familiar expression is that imme-

diately upon shipment the ship is bound to the cargo, and the cargo to the ship, for the faithful performance of the contract of carriage.

The act of 1851 simply provides that when such a lien has attached the shipowner may, if he chooses, limit the remedy of the lienor to the offending ship, and confine his recovery to that which he may·be able to get out of the ship.

It is reasonable that time should be given the shipowner in which to make his election, whether to stand his liability for the whole loss or to refer the claimants to the offending *res* alone; nevertheless, the plainest principles of equity require that the time so granted should not be permitted to change the relative situations of the parties to the *advantage* of either.

In a case like this, where damages done to an offending *res* (in which, by reason of the offence, the whole right of the owner has become appropriated by statute to the satisfaction of the sufferers by that offence, and the owners absolved from liability for their claims) is paid for by an insurer, the reason of the rule will necessitate the surrender of the insurance moneys to those sufferers, and will not permit the owner to retain them to his own use, because the loss is *not* his own, and he does *not* remain personally liable for the debt.

We do not claim that if before the happening of the loss the vessel had been transferred to a trustee under the statute any then existing policy of insurance would by force of that transfer have passed so as to give the trustee a right of action in his own name against the underwriter in respect of a subsequent loss; but we do claim that if in such a case the assured should recover, his recovery would in equity be to the use of the beneficiaries under the trust; and that by the force of a transfer made *after* the loss the right of action on the policy would pass to the trustee.

*Mr. Jeremiah Halsey* (*Mr. J. W. C. Leveridge* was with him on the brief), for appellee.

That the petitioners are entitled to the limitation which the statute gives is settled in the case of *Norwich Co.* v. *Wright,* 13 Wall. 104. The proceeding, whenever taken, is a proceed-

ing to obtain the benefit of the statute, and the court must give the full limitation allowed by it, or it can give nothing. The rule of the general maritime law is to be adopted; under which the owner's liability is limited to his interest in the vessel and cargo; *i. e.*, to that which the general maritime law would have compelled him to surrender, in order to be discharged from liability. This amount has been accurately fixed by the report of the commissioner in this proceeding.

The rule of limitation under the general maritime law that the liability is limited to the ship and freight refers only to the property which the shipowner has put at risk in the maritime venture—to his *sea* fortune, not to his *land* fortune. The proceeding to obtain the benefit of this limitation, which is quite a different thing, is the surrender of the ship and freight in the manner provided for by the law of the country. See Caumont Dict. Com. Mar. *Abandon*, § 8; 1 Bédarride, Code de Com., § 297. *The Scotland*, 105 U. S. 24; *Thommessen* v. *Whitwill*, 21 Blatchford, 45. But the rule of limitation itself, which is universal, without regard to local proceedings to enforce it, confines the liability to the condition of the ship in her damaged condition. Strong J. in 21 Blatchford, 231. And proceedings to obtain the benefit of the act, though taken subsequently, are taken as of the time of the disaster.

The claim that the value after the collision and before the fire should have been taken as the value under the statute is untenable, because the fire was the result of the collision, and the two cannot be separated.

The main question relates to the insurance. This court has intimated in previous cases its opinion that insurance recovered forms no part of the amount for which ship owners are liable. *The Benefactor*, 102 U. S., at page 246; *The North Star*, 106 U. S., at page 29; *Norwich Co.* v. *Wright*, 13 Wall. at page 126; *The Scotland*, 105 U. S. at page 28; *Moore* v. *Am. Trans. Co.*, 24 How. at page 29; which is in accord with the general doctrine that an insurance policy is a personal contract. *Mildmay* v. *Folgham*, 3 Ves. Jr. 471; *Vernon* v. *Smith*, 5 B. & Ald. 1.

This view has been held uniformly by District and Circuit

Courts. *Wattson* v. *Marks*, 2 Am. Law. Reg. 157; *Pet'n, Norwich & N. Y. Trans. Co.*, 8 Ben. 312; *S. C.*, 17 Blatchford, 221; *The Peshtigo*, 2 Flippin, 466; *Thommessen* v. *Whitwill*, 21 Blatchford, 45; *City of Columbus*, 22 Fed. Rep. 460.

The soundness of this uniform line of decisions is now before the court for determination. It is respectfully submitted, that the interest in the vessel, which is the measure of liability under § 4283, and a transfer of which, if made under § 4285, operates to discharge the claim for loss or damage, does not include a claim for insurance money received by the owners of the vessel.

I. The proper construction of the statute leads to this result. Ships are usually owned in shares. The obvious purpose of the word "interest," is to indicate that each co-owner's liability is limited to his share (which is his interest), and is not to extend to the entire vessel. To extend his liability beyond this to the insurance money would cause a word used for the purpose of limiting liability to operate in a contrary sense. This would violate settled rules of construction.

The word "interest" extends to the freight as well as the ship. If both were totally lost to their owners "by a surrender to the waves," could it be contended, in the light of the reported expressions of this court in relation to freight, that insurance on freight was to be surrendered?

The construction of § 4283, is aided by the language of § 4284, being § 4 of the original act, which describes the liability as "the whole value of this vessel, and her freight for the voyage."

It is now settled by the decisions of this court that all claims for damages arising from the disaster stand upon an equality, when the whole value is insufficient to make full compensation, and that the measure of the owner's liability is the same whether he surrenders his interest under § 4285, or takes "appropriate proceedings" under § 4284.

The "whole value of the vessel and freight for the voyage" is then clearly the limit of the liability, and in case of part owners each is liable only for the value of his interest or share in the ship. This construction gives full effect to the language of each section, and renders them harmonious.

A policy of insurance on a vessel is not an interest in the vessel itself. It is a right existing by itself, and is the representative of the premium. In addition to the authorities already cited, see *McDonald* v. *Black*, 20 Ohio, 185; *Wilson* v. *Hill*, 3 Met. 65; *Powles* v. *Innes*, 11 M. & W. 10; *Columbian Ins. Co.* v. *Lawrence*, 10 Pet. 512; *Plympton* v. *Ins. Co.*, 43 Vt. 497; *Gleason* v. *First Nat. Bank*, 13 Fed. Rep. 719.

There is no inequity in this construction. This statute was enacted to free shipowners from the severe rules of the common law. See *New Jersey Steam Nav. Co.* v. *Merchants' Bank*, 6 How. 344. It is in harmony with the general maritime law. *Stinson* v. *Wyman*, 2 Ware, 172; and should be so construed as to carry out the policy introduced in its enactment. See the debates in Congress on the passage of this act.

By the general maritime law, the shipowners (if personally free from blame) were not liable for the negligent or wrongful acts of the master and crew, beyond the amount of their interest in the ship. So that if they surrendered the ship they were discharged. *Norwich Co.* v. *Wright*, 13 Wall. at page 116; *The Scotland*, 105 U. S. at page 28.

In the first of these cases this court (on page 11) quotes from Pardessus, intimating that insurance must be surrendered. But this extract, taken from an early edition, is not contained in the edition of 1841, where it would seem that he has a doubt of its correctness, and in any event he stands alone. Many other and far more weighty authorities are against him. See 1 Boulay-Paty, Droit Com. Mar. 297; de Villeneuve & Massé, Dict. Cont. Com. *Armateur* § 18; Éloy & Guerrand, Capitaines Mait. et Pat. 270; 1 Bédarride, Com. Mar. 359; Valin, Com. sur l'Ord de la Marine.

In addition to the sections of Caumont's Dictionnaire du Droit Maritime, referred to in the opinion of the District Court, we refer also to sections 57 and 58.

The 7th section of the same article states the earlier authorities for the general rule, as follows: "The ordinance of 1681, and the jurisprudence of the Parliament of Aix, while it had authority, decided that the owner never exposed anything but his ship to the chances of navigation; that is to say, his sea

property and not that of the land. So taught also Loccenius and Vinnius; Decree of Parl. of Aix, 18 May, 1761, Émerigon, Contrats à la grosse, ch. 4, Section 4, § 5; Consul. de la Mer. ch. 194 and 239; Grotius, Stypmann, part 4, ch. 15, No. 120; Kuricke, Quest. 21; Pothier, Traité des Obligations, No. 451 and Charter parties; Boulay-Paty 1, 270; Dageville 2, 111; Frémery, p. 189; Court of Cassation, 9 March, 1814, at Rennes, 16 Jan., 1821; at La Haye, 4 Nov., 1824; at Marseilles, 20 Sept., 1831.

*Mr. C. R. Ingersoll,* for appellants Wright and another.

1. The court below erred in not apportioning among the sufferers by the steamer's fault the whole value of the owner's interest in the offending vessel at the time the limitation of liability was sought; such value being fixed by the stipulation at $70,000. That the stipulation taken upon the release of the vessel from custody is (independently of any peculiar provision) a substitute for the released vessel, and that the rights and remedies of all parties interested in the released vessel remain unaffected by the substitution, and are to be regarded precisely the same as though the vessel itself was now in court, as the actual *res* to be subjected to its decrees, we suppose will be conceded. *United States* v. *Ames,* 99 U. S. 35, 42; *The Wanata,* 95 U. S. 600, 611.

When this statute was enacted the general maritime law as administered, not only in the United States, where no limitation of the shipowner's liability by Federal law obtained, but in continental Europe and England, also, where the limitation existed, entitled the lien-creditor to the full amount of the owner's interest in the vessel as that interest might be at the time of its appropriation for his benefit. *The Rebecca,* 1 Ware, 188; *The Maggie Hammond,* 9 Wall. 449; *The China,* 7 Wall. 68; *The Siren,* 7 Wall. 155; *The Alive,* 1 W. Rob. 111; *The Europa,* 2 Moore P. C. N. S. 1; *The Charles Amelia,* 2 L. R. Adm. & Eccl. 330; *The Bold Buccleugh,* 7 Moore P. C. 267.

This maritime lien or hypothecation of the vessel, adheres to the ship from the instant it attaches—as a proprietary interest

—a *jus in re*—and travels with her wherever she may go and in whatever condition she may be, so long as her identity as a ship is preserved.

However it may be in England, where the administration of the general maritime law has been largely influenced by common law rules and practice, it is very certain that in this country, and particularly in this court, the doctrine of the general maritime law, as declared in *The Rebecca* (p. 203), has been uniformly followed, and the master of the ship regarded " not precisely as the agent, or, in the language of the civil law the *præpositus* of the owners, but as standing with regard to them in a peculiar relation which was expressed by the term commendatory."

And therefore, as Émerigon says (as quoted by Judge Ware, p. 204): "The obligations of the proprietors are rather real than personal. . . . The master's legal power does not extend beyond the ship of which he is the master, that is the administrator."

And later commentators upon the general maritime law are in accord with this. Bédarride in his Commentaire du Code de Commerce, Paris, 1859, vol. 1, art. 216, says:

"The responsibility of the owner rests upon the basis that those who have directly or indirectly dealt with the captain, acting in that character, and within the limits of his power, have really dealt with the ship itself, which becomes the principal bound."

Out of this responsibility which the maritime law imposes upon the offending vessel, has grown the peculiar remedy of the court of admiralty, *in rem*. Its sole purpose is to enforce the lien by which the ship is bound.

Also out of this distinction between the liability of the vessel and the liability of the person grew the mode by which the principle of limiting the personal liability of the shipowner to his sea-fortune was carried into effect. He was allowed to limit his own liability by limiting the creditor to the remedy which the maritime law gave him against the ship; but he could not limit the liability of the ship, or impair the remedy which the maritime law gave the creditor *in rem*.

It seems to be clear that by the general maritime law : (1.) The ship was primarily liable for the faults of its navigation, the owner's liability being through the ship. (2.) The owner could, therefore, discharge himself from this liability by relinquishing to the creditor his interest in the ship ; in other words he could limit the remedy of the creditor to that part of his property which was invested in the ship, as the representative of his sea fortune. But against this sea fortune, after the limitation arose, the remedy of the creditor was absolute. (3.) This limitation of the creditor's remedy could not arise except by some positive act of the owner, advising the creditor that he could pursue his remedy against the ship without any opposition from the owner. And until such act of "abandonment" the liability of the owner and the remedies of the creditor remained unlimited.

Boulay-Paty makes this clear in contrasting the "abandonment" of Art. 216 of the French Commercial Code with the "délaissement" to the insurer, 1 Droit Com. Mar. 293 : "Article 216 does not attach the same effect to the abandonment which it (Art. 369) authorizes ; it is the simple declaration of the shipowner that he makes no claim whatever to that property ; it is a mere turning over of the property to the shipper that he may pay himself, if he can, out of the *res* solely, and not out of the person of the owner, whose obligation, according to the expression of Émerigon, is rather real than personal."

That this abandonment or quit-claim of the ship must leave to the creditor the whole value of the ship quit-claimed, and as she is quit-claimed, seems obvious. And so by the maritime law, as administered under the Commercial Code of France, the shipowner, upon the occurrence of a disaster to his ship, bringing him under liability, if he has not renounced his legal right of surrender or abandonment expressly, or tacitly, may make the surrender at any time thereafter. Caumont Dict. Dr. Mar., tit. *Abandon*. From this it must follow that the ship when abandoned to the creditors, (after collision,) may be in a different condition, and of a very different value to that when she came out of the collision. And further, under the

maritime law as administered in France, we understand that
the shipowner who should, after a collision resulting in serious
damage to his vessel, repair his vessel fully and for a new voy-
age, would be held to have elected not to abandon, and, there-
fore, could not thereafter set up his privilege of limitation
against the creditor.

Upon this review of the maritime law as it was administered
when the act of March 3, 1851 was passed, it is plain that, at
that time, the sufferer by collision, in this country, had his
remedy against the offending vessel to the full extent of the
value of the owner's interest in that vessel at the time when
such value was sought to be appropriated for his benefit. That
remedy was not taken from him by the act.

The statute created no new tribunal; conferred no new
jurisdiction on existing tribunals; it only declared, for the
guidance of all courts, the measure of the shipowner's liability.
It had a twofold purpose: 1, (derived from continental law), to
limit the shipowner's liability in every case of loss without
his privity to the value of his interest in the vessel and pend-
ing freight, to be the same whether the creditors are one or
many, and in all cases: 2, (from the English Equity System), to
apportion that value among the sufferers by the wrong, in the
special case where there are several on the same voyage and
the whole value of the vessel and freight is not sufficient to
make compensation to each of them.

The construction which is now sought to be put on the act
is this: that in cases of collision it was intended to limit, not
only the liability of the owner of the offending vessel, but the
liability of the offending vessel itself, also; the limit, in each
case, being the value of the owner's interest in the vessel, as
that interest was at a certain point of time, namely, immedi-
ately after the collision. This is a radical change in the mari-
time law of the country, which if Congress had intended, it
would have clearly expressed. The statute expresses but one
measure for the owner's liability, and that is the value of the
vessel when it shall be transferred for the benefit of the credi-
tor; and from this premise the only sound conclusion is, that
where there is an existing vessel, the owner's liability is, there-

fore, the value of that vessel when either the vessel itself or its representative value shall be appropriated for the benefit of the creditor.

But if the provision in the statute respecting a transfer is decisive evidence, as the court found it to be, of the intention of the statute to measure the owner's liability by the value of the vessel at some time after the collision, is it not with greater reason decisive evidence that the statute intends the absolute liability to remain until the owner shall either transfer the vessel "in compliance with the requirements of the act," or do some other equivalent thing? And does it not necessarily follow that the equivalent thing to do must be something which will give to the claimants the value of the vessel at the time the thing is done? And, therefore, if the owner may pay the value into court instead of transferring the vessel to a trustee, that such value must be the value of the vessel as she then is when the payment into court is made?

The provisions of § 3 of the act are in harmony with the provision for a transfer. Taking the statute as a whole, the measure of the owner's liability is his interest in that ship or vessel which by the maritime law is responsible in specie for the injury—the vessel which is bound by the tacit hypothecation of the maritime lien to pay "with its whole value" the losses resulting from its fault—and the vessel which the owner may transfer to a trustee for the benefit of his creditors if he desires to comply with the requirements of the statute. And so long as that vessel exists and is liable to admiralty seizure at the suit of the creditor or to "transfer" by the owner, so long it continues, with its present value, to measure the liability of its owner. The declaration of § 3 is only the declaration of the maritime law that the shipowner, in the cases there mentioned, may restrict his creditor to the remedy (in effect) which the maritime law gives him *in rem*—against the vessel, or, as it is expressed in *The China* supra, the "primary liability" is regarded as upon the vessel and the limitation "limits the creditor to this part of the owner's property." For the statute, it will be observed, makes no attempt to interfere with the ordinary jurisdiction of the admiralty court *in rem*.

Indeed this provision for a transfer "to a trustee" seems to have been intended for the purpose of affording the State or common law courts (and the act of 1851 had its origin in States having similar legislation) a method of applying the statute analogous to that which is peculiar to the admiralty court.

II. The District Court of the United States for the Eastern District of New York, was without jurisdictional power to do anything else, upon the appellee's petition, than to apportion among the claimants, the stipulated value of the condemned steamer, that is, $70,000. *The Benefactor*, 103 U. S. 214, 249; *James* v. *London & Southwestern Railroad Co.*, 7 L. R. Exch. 287.

III. The apppellee became bound by the proceedings taken upon its petition of October 2, 1866, for the benefit of the act of March 3, 1851, resulting in the stipulation of March 28, 1867, to pay into court the sum of $70,000 for apportionment among the lien-creditors.

IV. The Circuit Court, having adopted as the measure of the owner's liability the value of his interest in the vessel at the time immediately after the collision, and, as reduced by it, erred in its computation of that value. It should have found that value as of the time immediately after the collision and before the fire had supervened; and either have computed that value as the value before the collision, reduced only by the damage caused by the collision, or the value after the fire increased by the insurance received on account of the fire. *Brown* v. *Wilkinson*, 15 M. & W. 391; *Wyman* v. *Wyman*, 26 N. Y. 353; *Burbank* v. *Insurance Co.*, 24 N. H. (4 Foster) 550; *Parry* v. *Ashley*, 3 Sim. 97.

V. But even if the measure of the owner's liability adopted by the Circuit Court shall be intended to be as of the time immediately after the fire, or when the steamer was lying at the bottom of the Sound, the computation of that value by the Circuit Court is still erroneous. The value of the insurance should have been carried into the valuation of the owner's interest.

Mr. JUSTICE BRADLEY, after stating the case in the language reported above, delivered the opinion of the court.

The first ground of error which we shall notice is the alleged want of jurisdiction in the District Court to allow a reappraisement of the steamboat for the purpose of fixing her value as the limit of the owner's liability, after her value had once been appraised at $70,000, and she had been delivered to the claimants upon their stipulation for that amount. This ground cannot be maintained, because the question had not then been decided, what particular time was to be taken for fixing the value of the vessel in reference to the limited liability of the owners. They wished to have possession of her, and were willing to give a stipulation for her full value at that time in order to obtain such possession. Had the vessel remained in custody until the final petition for a limited liability was filed, the court would have been at liberty then to determine the time at which the value of the vessel should be taken for that purpose, and to order a new appraisement if necessary. The stipulation given merely stood in place of the vessel itself, and did not deprive the court of any of its power. The subsequent trial on the merits, the interlocutory decree in favor of the libellants, and the report of the commissioner showing the amount of their damage, did not preclude the claimants from exercising their right to proceed for a limitation of their liability under the rules of procedure adopted by this court. The trial on the merits resulted in determining which vessel was in fault, and in liquidating the amount of damage sustained by the libellants, to be used as a basis of their *pro rata* share in the fund which might ultimately be decreed subject to their claim and the claims of other parties. It did not settle the amount of that fund, nor the extent of the liability of the owners of the steamer. In the case of *The Benefactor*, 103 U. S. 239, 244, this matter was fully considered, and we held that "the amount recovered, whether before the limitation proceedings are commenced, or afterwards, and whether in the court of first instance, or an appellate court, will stand as the recoverer's basis for *pro rata* division when the condemned fund is distributed. In all other respects the proceedings for obtaining a

limitation of liability may proceed in ordinary course." In view of the want of any settled practice on the subject, this court, in its opinion in the case of *Norwich Co.* v *Wright*, suggested the precise course which was taken by the petitioners. 13 Wall. 126. We think it was the proper course, and that the District Court had jurisdiction to entertain the petition, and to order a new appraisement.

·The next question to be considered is, at what time ought the value of the vessel and her pending freight to be taken, in fixing the amount of her owners' liability. Ought it to be taken as it was immediately before the collision, or afterwards? And if afterwards, at what time afterwards? The first question has been repeatedly answered by the decisions of this court. We held in *Norwich Co* v. *Wright*, and have held and decided in many cases since, that the act of Congress adopted the rule of the maritime law as contradistinguished from that of the English law on this subject; and that the value of the vessel and freight after, and not before, the collision is to be taken. But at what precise time after the collision this value should be taken has not been fully determined so as to establish a general rule on the subject. That is a question which deserves some consideration. In the case of *The Scotland*, 105 U. S. 24, the collision occurred opposite Fire Island Light, and the steamer, being much injured, put back in order, if possible, to return to New York, but was unable to get further than the middle ground outside and south of Sandy Hook, where she sank, and nothing was saved but a few strippings, taken from her before she went down. We held that these strippings were all of the ship that could be valued, although she had run thirty or forty miles after the collision. The value was taken, not as it was, or as it might have been supposed to be, immediately after the collision, but as it was after the effects of the collision were fully developed in the sinking of the ship.

An examination of the statute will afford light on this subject. Section 4283 declares that the liability of the owner of any vessel [for various acts and things mentioned] shall "in no case" exceed the value of his interest in the vessel and her

freight then pending.    When it says "in no case," does it mean that for *each case* of "embezzlement, loss, destruction, collision," &c., happening during the whole voyage his liability *may* extend to the value of his whole interest in the vessel? Twenty cases might occur in the course of a voyage, and all at different times.    Does not the provision made in § 4284, for compensation *pro rata* to each party injured, apply to all cases of loss and damage happening during the entire voyage; happening, that is, by the fault of the master or crew, and without the privity or knowledge of the owner?    Pending freight is of no value to the shipowner until it is earned, and it is not earned, if earned at all, until the conclusion of the voyage. Does this not show that every "case" in which the principle of limited liability is to be applied means every voyage?    We think it does.    It seems to us that the fair inference to be drawn from § 4283 is, that the *voyage* defines the limits and boundaries of the *casus*, or case, to which the law is to be applied.

This is rendered certain by the language of § 4284, which is : "Whenever any such embezzlement, loss, or destruction is suffered by several freighters, or owners of goods, wares, merchandise, or any property whatever, *on the same voyage*, and the whole value of the vessel, and her freight *for the voyage*, is not sufficient to make compensation to each of them, they shall receive compensation from the owner of the vessel in proportion to their respective losses."    There may be more than one case of embezzlement during the voyage, and more than one case of loss and destruction, and they may happen at different and successive times, yet they are to be compensated *pro rata*. This shows conclusively that it must be at the termination of the "voyage," that the vessel is to be appraised, and the freight (if any be earned) is to be added to the account for the purpose of showing the amount of the owner's liability.

This conclusion is corroborated by § 4285, which declares that it shall be a sufficient compliance with the requirements of the law if the owner shall transfer his interest in the vessel and freight to a trustee for the benefit of the claimants.    In most cases this cannot be done until the voyage is ended, for, until

then, the embezzlement, loss, or destruction of property cannot be known.

And this was manifestly the maritime law, for by that law the abandonment of the ship and freight (when not lost) was ·the remedy of the owners to acquit themselves of liability; and, of course, this could only be done at the termination of the voyage. If the ship was lost, and the voyage never completed, the owners were freed from all liability. Boulay-Paty, Droit Com. Mar., tit. III. sec. 1, vol. I. pp. 263, 275, &c.; Émerigon, Contrats à la grosse, ch. 4, sec. 11, §§ 1, 2; Valin, Com. lib. II. tit. VIII. art. II.; Consolato del Mare, chs. 34, (141) 186, (182) 227, (194) 239; 2 Pardessus, Collection des lois Maritimes antérieur au XVIII. Siècle; Cleirac, Nav. de Rivières, art. XV.

If, however, by reason of the loss or sinking of the ship the voyage is never completed, but is broken up and ended by causes over which the owners have no control, the value of the ship (if it has any value) at the time of such breaking up and ending of the voyage must be taken as the measure of the owner's liability. In most cases of this character no freight will be earned; but if any shall have been earned, it will be added to the value of the ship in estimating the amount of the owner's liability. These consequences are so obvious that no attempt at argument can make them any plainer.

If this view is correct, it follows, as a matter of course, that any salvage operations, undertaken for the purpose of recovering from the bottom of the sea any portion of the wreck, after the disastrous ending of the voyage as above supposed, can have no effect on the question of the liability of the owners. Their liability is fixed when the voyage is ended. The subsequent history of the wreck can only furnish evidence of its value at that point of time. And it makes no difference, in this regard, whether the salvage is effected by the owners, or by any other persons. Having fixed the point of time at which the value is to be taken, the statute does the rest. It declares that the liability of the owner shall in no case exceed the amount or value of the interest of such owner in such vessel, and her freight then pending. If the vessel arrives in port in a damaged con-

dition, and earns some freight, the value at that time is the measure of liability; if she goes to the bottom and earns no freight, the value at that time is the criterion. And the benefit of the statute may be obtained either by abandoning the vessel to the creditors or persons injured, or by having her appraisement made and paying the money into court, or giving a stipulation in lieu of it, and keeping the vessel. This double remedy given by our statute is a great convenience to all parties. It does not make two measures or standards of liability; for the measure is the same whichever course is adopted; but it enables the owner to lay out money in recovering and repairing the ship, without increasing the burden to which he is subjected.

It follows from this, that the proper valuation of the steamer was taken in the court below, namely, the value which she had when she had sunk, and was lying on the bottom of the sea. That was the termination of the voyage.

The next question to be considered is, whether the petitioners were bound to account for the insurance money received by them for the loss of the steamer, as a part of their interest in the same. The statute, § 4283, declares that the liability of the owner shall not exceed the amount or value of his *interest in the vessel and her freight;* and § 4285 declares that it shall be a sufficient compliance with the law, if he shall transfer his *interest in such vessel and freight*, for the benefit of the claimants, to a trustee. Is insurance an interest in the vessel or freight insured, within the meaning of the law? That is the precise question before us.

It seems to us, at first view, that the learned justice who decided the case below was right in holding that the word "interest" was intended to refer to the extent or amount of ownership which the party had in the vessel, such as his aliquot share, if he was only a part owner, or his contingent interest, if that was the character of his ownership. He might be absolute owner of the whole ship, or he might own but a small fractional part of her, or he might have a temporary or contingent ownership of some kind or to some extent. Whatever the extent or character of his ownership might be, that is to

say, whatever his interest in the ship might be, the amount or value of that interest was to be the measure of his liability.

This view is corroborated by reference to a rule of law which we suppose to be perfectly well settled, namely, that the insurance which a person has on property is not an interest in the property itself, but is a collateral contract, personal to the insured, guaranteeing him against loss of the property by fire or other specified casualty, but not conferring upon him any interest in the property. That interest he has already, by virtue of his ownership. If it were not for a rule of public policy against wagers, requiring insurance to be for indemnity merely, he could just as well take out insurance on another's property as on his own, and it is manifest that this would give him no interest in the property. He would have an interest in the event of its destruction or non-destruction; but no interest in the property. A man's interest in property insured is so distinct from the insurance, that unless he has such an interest independent of the insurance, his policy will be void.

This rule of law manifests itself in various ways. If a mortgagor insures the property mortgaged, the mortgagee has no interest in the insurance. He may stipulate that the policy shall be assigned to him, and the mortgagor may agree to assign it; and if it be assigned with the insurer's consent, the mortgagee will then have the benefit of it; or, if not assigned according to agreement, the mortgagee may have relief in equity to obtain the benefit of it.

So where property is sold, the insurance does not follow it, but ceases to have any value, unless the insurer consent to the transfer of the policy to the grantee of the property. In other words, the contract of insurance does not attach itself to the thing insured, nor go with it when it is transferred.

It is hardly necessary to cite authorities for a rule which has become so elementary. We will only refer to a few of them. Lord Chancellor King in *Lynch* v. *Dalzell*, 4 Bro. P. C. 431, 2d ed., London, 1803 [Vol. 3, p. 497, 1st ed.]; *S. C.*, 2 Marsh. on Ins. 801; Lord Hardwicke in *Sadlers Co.* v. *Badcock*, 2 Atk. 554; *Carroll* v. *Boston Mar. Ins. Co.*, 8 Mass. 515; *Columbia Ins. Co.* v. *Lawrence*, 10 Pet. 507, 512; *Carpenter* v. *Prov.*

*Wash. Ins. Co.*, 16 Pet. 495, 503; *Ætna Ins. Co.* v. *Tyler*, 16 Wend. 385, 397; *Wilson* v. *Hill*, 3 Met. 66, 68; *Powles* v. *Innes*, 11 M. & W. 10, 13; *McDonald* v. *Black*, 20 Ohio, 185; *Plympton* v. *Ins. Co.*, 43 Vt. 497. *Carroll* v. *Boston Marine Ins. Co.*, *Powles* v. *Innes*, and *McDonald* v. *Black*, were cases of marine insurance, and the same rule was followed in those cases as in cases of insurance against fire.

It is not an irrelevant consideration in this regard, that the owner of the property is under no obligation to have it insured. It is purely a matter of his own option. And being so, it would seem to be only fair and right, and a logical consequence, that if he chooses to insure, he should have the benefit of the insurance. He does not take the price of insurance from the thing insured, but takes it out of the general mass of his estate, to which his general creditors have a right to look for the satisfaction of their claims. They are the creditors who have the best right to the insurance.

Stress is laid upon the hardship of the case. It is said to be unjust that the shipowner should be entirely indemnified for the loss of his vessel, and that the parties who have suffered loss from the collision by the fault of his employés should get nothing for their indemnity. This mode of contrasting the condition of the parties is fallacious. If the shipowner is indemnified against loss, it is because he has seen fit to provide himself with insurance. The parties suffering loss from the collision could, if they chose, protect themselves in the same way. In fact, they generally do so; and when they do, it becomes a question between their insurers and the shipowner whether they or he shall have the benefit of his insurance. His insurers have to pay his loss. Why should not the insurers of the other parties pay their loss? The truth is, that the whole question, after all, comes back to this: Whether a limited liability of shipowners is consonant to public policy or not. Congress has declared that it is, and they, and not we, are the judges of that question.

Having, as we think, ascertained the true construction of the statute, the point in dispute is really settled. It is a question of construction, and does not require an examination of the

general maritime law to determine it. If the rule of the maritime law is different, the statute must prevail. But from such examination as we have been able to make, we think that the weight of maritime authority is in accord with the disposition of our statute as we have construed it, and that the statute has adopted the maritime law on this point as well as on the question of time for estimating the value of the ship.

The contract of insurance is of modern origin. It is not mentioned in the early treatises or compilations of maritime law. It is but little noticed prior to the sixteenth century. On a question like the present we naturally turn to the French writers, who are distinguished for their great learning and acumen on maritime subjects. The principal text law on which they rely, prior to the Code of Commerce adopted in the present century, is the Ordonnance de la Marine of 1681. By this ordinance it is declared that the owners of ships shall be responsible for the acts of the master: but they shall be discharged therefrom by abandoning their vessel and the freight. The Code of Commerce, Art. 216, has substantially the same provision. Beyond this general declaration (which is simply an announcement of the maritime law on the subject), the special rules applicable to particular cases, and necessary for securing the benefit of the general rule in all, had to be drawn from the general principles of the same maritime law. Whether in abandoning the ship to the creditors, the owners are, or are not, obliged to abandon the insurance effected on the ship, is a question which had to be decided by the application of the general principles referred to.

The history of opinion amongst maritime writers on this subject is briefly this: Valin and Émerigon, two great French jurists, contemporaries and friends, wrote on the maritime law. In 1760 Valin published his New Commentary on the Ordinance of the Marine of 1681. In 1783 Émerigon published his Treatise on Assurances and Contracts of Bottomry. (Traité des Assurances et des Contrats à la grosse.) Émerigon furnished Valin a large portion of the materials of which the latter's commentary was composed. Both of them are regarded as great authorities on maritime law. These jurists differed on the

question we are considering. Valin thought that those who furnished materials and supplies for a ship, and those who labored on its construction or repair, should have the power of transferring their lien on the vessel to the insurance money received by the owner for its loss. He reasons that this should be so because the material men and the workmen helped to make the thing which forms the subject of the insurance; whilst he admits that the Parlement of Bordeaux had decided otherwise as late as September, 1758. So that the views expressed by Valin seem to be his opinion of what the law ought to be rather than what it was. (Valin Com., vol. I. 315, 316, lib. I. tit. XII. art. III.)

Émerigon strenuously opposes Valin's opinion. His reasons are, that liens are *stricti juris*, and are not to be extended by construction; that if Valin's rule is well founded, a vendor on credit would have a lien on the price arising on a subsequent sale of the same thing by his vendee after the thing itself had ceased to exist, which was contrary to repeated decisions; that, by stronger reason, material men and workmen have no lien on the assurance of a ship which never belonged to them, for there is nothing essentially common between the right' of pledge and that of property; that the ordinance gives no privilege to the material men and workmen, except on the ship, and, therefore, they have none on the insurance according to the rule of strict construction already stated; that if the ship were represented by the insurance, it would be necessary to give the same privilege to the seamen and all other privileged creditors, which would destroy the whole object of insurance; that, on the same principle, insurance ought to be represented by reinsurance, which, it is well settled, cannot be done. Émerigon, Contrats à la grosse, ch. 12, sec. 7.

The opinion of Émerigon was followed with but little dissent until a recent period. The most prominent writer who disagreed with him was Pardessus, who, in the first edition of his Droit Commercial, published in 1814, (Art. 663,) after stating the general rule that the owner may discharge himself from responsibility by abandoning the ship and freight, added: "If these things have been insured, he ought to abandon also

his rights against the insurers." This sentiment is repeated as his personal opinion in the subsequent editions of his work, (same art. 663,) but he is obliged to concede that the law is otherwise. In the edition of 1841, article 594, 2d, after asking the question whether a creditor, having a privilege or a hypothecation on a thing insured, could require a distribution of the insurance money as would be made of the price on a sale, he says: "I think not; there is not the same reason. In the case of sale the price must, in the nature of things, represent the thing sold, the owner parting with it only for that; in the case of insurance the thing has perished; it has not been assigned in consideration of any price. The debtor has procured, it is true, a guaranty, by the effect of which the insurer pays him the value of it; but this guaranty is the result of an agreement independent of the engagements of the assured with any particular creditors. The value paid does not represent the thing insured, except in the relations between the insurer and the insured; not in the relation between the latter and his creditors, except as an accession to the mass of his property, against which the creditors may prosecute their actions according to the principle of the civil law by which all the property of a debtor is the common pledge of his creditors; but without any preference, none of them having a peculiar right to a privilege on the contract of insurance which has caused the amount assured to be added to the assets of the common debtor. It would be otherwise, undoubtedly, if the debtor, in borrowing upon a hypothecation of a house insured, should at the same time assign to his creditor the contingent benefits of the insurance to serve for his discharge to that extent, and if the creditor should duly notify the insurer," &c.

This passage shows that even Pardessus admitted the law to be as Émerigon had declared it.

Boulay-Paty, the contemporary of Pardessus, who published his work on Maritime Commercial Law (Droit Commercial Maritime) in 1821, warmly espouses the views of Émerigon. His observations on the subject are exceedingly sensible and persuasive. After quoting the views of Valin and Émerigon, he says: "We must agree that Émerigon's opinion is most

conformable to principle, and that the transfer or subrogation of which Valin speaks is not admissible," that is, the transfer of the lien from the property to the insurance. He adds: "The axiom *subrogatum tenet locum subrogati* should be understood as applicable, when the thing has been changed into something else by the owner, who has received the other thing in its place, as in the case when the owner of a ship has sold it, it is certain that the lien is transferred according to undoubted law to the price. But when the thing is perished in the hands of the debtor certainly all lien is extinct. (L 8 ff *quibus modis pignus vel hypotheca solvitur*.) Is it possible to suppose that an insurance, which is an agreement, foreign to the creditors holding liens, which has been effected between the owners and a third party, can have the effect to bring again into life the lien on the ship?" (Vol. I. p. 135.)

He goes on to argue the question at great length, and with much force; but it would extend this opinion too much to quote his argument at length. One more extract will suffice. After showing the difference between abandonment to the lien creditors and surrender to the insurers, and that the latter does not interfere with or prevent the former, he says:

" The product of the insurance is the price of the premium which the shipowner has paid to insure the ship. This premium is not bound as a security for debts and obligations contracted by the captain; the law expressly binds the ship and freight alone to that. The Code of Commerce gives to shippers a lien only on ship and freight, consequently they have none on the insurance. In general the ship is not represented by the insurance, which, after the loss of the ship, becomes a right existing by itself, which gives a direct personal action in favor of the insured.

" All these principles, besides, agree with equity and the well understood interests of commerce. Without this rule, indeed, insurances on the hull of a ship would become illusory for her owner, since he would have no way, even by stipulating for a guaranty against barratry of the master, which it is customary to do, to protect himself against any other loss than that of the premium; and yet this is both the object of in-

surance and the motive for which the premium is paid." Vol. I. pp. 291, 292.

During the seven years from 1827 to 1834, an animated controversy was carried on in France on the question whether Article 216 of the Code of Commerce, in speaking of the "acts" (faits) of the master, meant to include his contracts lawfully made in the course of the voyage, or only his wrongful acts; and finally the matter came before the legislative body for solution. In 1841 that body modified Article 216 so as to expressly embrace contracts of the master, as well as other acts. It was, at the same time, sought to introduce a clause which should render it the owner's duty, in abandoning the ship and freight to obtain the benefit of limited liability, also to abandon his claim for insurance on them; but this provision failed to receive assent. The law remained as it had always been.

In 1859 two very able works were published in France in which the subject was again discussed; one by Edmund Dufour, entitled Droit Maritime; and one by J. Bédarride, entitled Droit Commercial, a commentary on the Code de Commerce.

Dufour attempted to renew the controversy, although he admitted that the views of Émerigon had been acquiesced in even by Pardessus, and that Valin stood alone. He says: "Doctrine and jurisprudence, after some hesitation, pronounced themselves, as is well known, against the existence of a privilege or hypothecation on the indemnity due from the insurer; and in that way the general principle which Émerigon had adopted as the basis of his theory penetrated men's minds as an indisputable truth which ought thenceforth to govern all indemnities of insurance. Thus it is, for example, that M. Pardessus, speaking of this question in relation to maritime credits, comes back for its solution to the general principles relating to insurance. So that the opinion of Valin seems to be crushed under this imposing unanimity." Dufour, Droit Maritime, Art. 261.

Dufour then devotes many pages to argue the question *ab origine*, persuading himself that he has established the correctness of Valin's views. But his admission at the beginning of his argument demonstrates that the maritime jurisprudence of France was in accordance with the opinion of Émerigon.

In consequence, probably, of this effort to bring the matter again into question, Bédarride examined the subject with great care, both on principle and authority, and showed that the law was not only settled, but should not be disturbed. Bédarride, Droit Commercial, Art. 295. But the advocates of change persisted in their efforts, until finally, on the 22d of December, 1874, on the passage of a law to render ships susceptible of hypothecation, they procured a section to be inserted (sec. 17) declaring that, in case of loss or disablement of the ship, the rights of the creditors [that is, hypothecation creditors] may be enforced, not only against the portions saved, or their proceeds, but (in the order of registry) against the proceeds of any assurances that may have been effected by the borrower on the hypothecated ship. This law, however, does not extend to tacit liens or privileges.

For further authorities in the French law, to the same effect as Boulay-Paty and Bédarride, see Pouget, Principes de Droit Mar., vol. 2, pp. 415–419, ed. 1858; Éloy et Guerrand, Capitaines, Mait. et Pat. vol. 3, art. 1894 (1860); Caumont, Dict. de Droit Mar., tit. *Abandon Mar.* §§ 54, 55; de Villeneuve et Massé, Dict. du Contentieux Commercial; *Armateur*, 20.

In Germany the history of the question has been, to some extent, the reverse of what it has been in France. The Prussian Code, adopted in 1794, allowed shipowners to "free themselves from responsibility in all cases by a surrender of the ship, including all benefits of the voyage and their rights against the insurers." But Prussia was the only country that adopted this rule in relation to insurance. In 1856 a scheme was set on foot to have a conference to prepare a general commercial code for all the German states. Commissioners were appointed by the several states for this purpose, who held repeated sessions, but came to no agreement on a general code until March, 1862. The Prussian commissioners strenuously urged the adoption of their law on the subject of subrogation to the claims for insurance. The arguments presented by them are spread before us at some length in one of the briefs of the counsel for the appellants. The convention, however, were not convinced, and rejected the proposition, and the Prussian commissioners were

obliged to yield the point, and now all Germany, under this new commercial code, adheres to the old maritime law. It is only necessary to add that, in the discussions of the convention it was conceded that the maritime law had never required the surrender of the insurance, but only that of the ship and freight. By the commercial code of Holland and the ordinance of Bremen this rule is expressly formulated.

It appears, therefore, that the disposition of our statute is in conformity with the general maritime law of Europe; and that the recent legislation in France (1874) is an innovation upon that law.

It is next contended that the act of Congress does not extend to the exoneration of the ship, but only exonerates the owners by a surrender of the ship and freight, and, therefore, that the plea of limited liability cannot be received in a proceeding *in rem*. But this argument overlooks the fact that the law gives a twofold remedy—surrender of the ship, or payment of its value; and declares that the liability of the owner, in the cases provided for, shall not exceed the amount or value of his interest in the ship and freight. This provision is absolute, and the owner may have the benefit of it, not only by a surrender of the ship and freight, but by paying into court the amount of their value, appraised as of the time when the liability is fixed. This, as we have seen, enables the owner to reclaim the ship, and put it into complete repair, without increasing the amount of his liability. The absolute declaration of the statute, that his liability shall not exceed the amount or value of the ship and freight, to wit, at the termination of the voyage, has the effect, when that amount is paid into court, under judicial sanction, of discharging the owner's liability, and thereby of extinguishing the liens on the vessel itself and of transferring those liens to the fund in court. This is always the result when the owner is allowed to bond his vessel by payment of its appraised value into court, or by filing a stipulation with sureties in lieu of such payment. The vessel is always discharged from the liens existing upon it, when it has been subjected to a judicial sale by order of the admiralty court, or when it has been delivered to the owner on his stipulation with sureties.

The claim that the lien attaches to the repairs and better-ments which the owner puts upon the vessel after the amount of his liability has been fixed is repugnant to the entire drift and spirit of the statute. In ordinary cases it may be true, and undoubtedly is true, that a lien or privilege on the ship extends to and affects all its accretions by repair or otherwise; but in the case of a claim for limited liability under the statute, the dispositions of the statute are to govern; and these, as we have seen, fix the amount of liability at a certain time; and when that liability is discharged the lien is discharged, no mat-ter what the then value of the ship may have come to be by means of alterations and repairs.

The time when the amount of liability should be paid into court will depend upon circumstances. If the owner sets up his claim to limited liability in his answer, and does not seek a general concurrence of creditors, it will be sufficient if the amount is paid after the trial of the cause and the ascertain-ment of the amount of liability in the decree. Payment and satisfaction of the decree will be a discharge of the owner as against all creditors represented in the decree.

To say that an owner is not liable, but that his vessel is liable, seems to us like talking in riddles. A man's liability for a demand against him is measured by the amount of property that may be taken from him to satisfy that demand. In the matter of liability, a man and his property cannot be separated, unless where, for public reasons, the law exempts particular kinds of property from seizure, such as the tools of a mechanic, the homestead of a family, &c. His property is what those who deal with him rely on for the fulfilment of his obliga-tions. Personal arrest and restraint, when resorted to, are merely means of getting at his property. Certain parts of his property may become solely and exclusively liable for certain demands, as a ship bound in bottomry, or subject to seizure for contraband cargo or illegal trade; and it may even be called the "guilty thing;" but the liability of the thing is so exactly the owner's liability, that a discharge or pardon extended to him will operate as a release of his property. It is true, that in *United States* v. *Mason;* 6 Bissell, 350, it was held that in a

proceeding *in rem* for a forfeiture of goods, the owner might be compelled to testify, because the suit is not against him but against the goods. That decision, however, was disapproved by this court in the case of *Boyd* v. *United States*, 116 U. S. 616, 637, in which it is said : "Nor can we assent to the proposition that the proceeding [*in rem*] is not, in effect, a proceeding against the owner of the property as well as against the goods; for it is his breach of the laws which has to be proved to establish the forfeiture, and it is his property which is sought to be forfeited. In the words of a great judge, 'Goods, as goods, cannot offend, forfeit, unlade, pay duties, or the like, but men whose goods they are.' Vaughan, C. J., in *Sheppard* v. *Gosnold*, Vaughan 159, 172 ; approved by Ch. Baron Parker in *Mitchell* v. *Torup*, Parker 227, 236."

But the argument is at war with the spirit as well as the text of our decisions on the subject of limited liability. The case of *The Benefactor*, 102 U. S. 214 ; *S. C.* 103 U. S. 239, is precisely in point. That was a case of libel *in rem* against the vessel in fault, and the proceeding for a limited liability was sustained. It is true that this particular point was not raised; but the parties in the case were represented by able and experienced counsel, and the point would certainly have been raised if they had regarded it as tenable.

We are not only satisfied that the law does not compel the shipowner to surrender his insurance in order to have the benefit of limited liability, but that a contrary result would defeat the principal object of the law. That object was to enable merchants to invest money in ships without subjecting them to an indefinite hazard of losing their whole property by the negligence or misconduct of the master or crew, but only subjecting them to the loss of their investment. Now, to construe the law in such a manner as to prevent the merchant from contracting with an insurance company for indemnity against the loss of his investment is contrary to the spirit of commercial jurisprudence. Why should he not be allowed to purchase such an indemnity? Is it against public policy? That cannot be, for public policy would equally condemn all insurance by which a man provides indemnity for himself

against the risks of fire, losses at sea, and other casualties. To hold that this cannot be done tends to discourage those who might otherwise be willing to invest their money in the shipping business. It would virtually and in effect bring back the law to the English rule, by which the owner is made liable for the value of the ship before collision—the very thing which, in all our decisions on the subject, we have held it was the intention of Congress to avoid by adopting the maritime rule. That this would be the result is evident, because all shipowners insure the greater part of their interest in the ship, and by losing their insurance they would lose the value of their ship in every case. No form of agreement could be framed by which they could protect themselves. This is a result entirely foreign to the spirit of our legislation.

When it was urged upon the Chamber of Peers of France, in 1841, to pass a law requiring the abandonment of insurance, as well as of ship and freight, in order to relieve the owner from liability, the suggestion was not entertained. The opinion of the majority was, that the relations between the shipowner and lenders or shippers ought to remain entirely independent of contracts of insurance which either could make; that an obligation to abandon insurance would have no other tendency than to prevent insurance by the owner, since he would be deprived of the benefit of it in case of loss. Bédarride, art. 295, vol. 3, p. 361.

The argument that to allow the owner to keep his insurance would encourage negligence and recklessness on his part, can always be made in every case of insurance. It has been made and answered a hundred times. Generally a sufficient portion of the value of the thing insured remains uncovered by insurance to prevent indifference to loss; and if the temptation to wish it does exist in any case, the retributions are so fearful as to repress the thought. To the honor of human nature the exceptions to the rule are exceedingly rare.

It is also contended that the right to proceed for a limited liability is waived and lost by a surrender of the vessel to the insurers, because it is then out of the owner's power to abandon the ship to the claimants who have liens upon her. This

argument assumes that abandonment is necessary, which is not the case under our law. Payment of the ship's value into court, or setting up the matter as a defence, is quite as efficacious. But if abandonment were necessary, as it is by the maritime law, a surrender to the insurers does not interfere with, or prevent, a subsequent abandonment to the creditors. The insurers take the ship *cum onere*, and stand in no better plight than the original owners. The liens against the ship are not extinguished by the surrender to the insurers, but may be prosecuted by the creditors, notwithstanding such surrender, unless proceedings for a limited liability are instituted. This is fully shown by Boulay-Paty, vol. 1, pp. 293–297, and by Bédarride, in Article 291 of his work, before cited. The former, after showing that abandonment to the lien creditors may be made notwithstanding a previous surrender to the insurers, and explaining the reason of it, says : "It follows from thence that the owner may, by abandonment, turn the shippers (of cargo) over to the insurers (now become the owners by the surrender of the ship and freight to them), and thus make abandonment and surrender at the same time." 1 Boulay-Paty, 295.

This disposes of all the important points in the case, and leads to the conclusion that the decree of the Circuit Court was right, and it is

*Affirmed.*

Mr. Justice Matthews, with whom concurred Mr. Justice Miller, Mr. Justice Harlan, and Mr. Justice Gray, dissented. Their dissenting opinion will be found at page 526 *post*, after the opinion of the court in *The Great Western*.